Good morning, Your Honor. Samuel Goldstein for the petitioner. Mr. Lekomtsev, would you like to reserve three minutes for rebuttal? Thanks. Russian law enforcement ambushed Mr. Lekomtsev on the street, took him to a police station, beat him, forced him to confess guilty to crimes he did not commit, and then falsely charged him with one such crime, all because he's a gay man. Mr. Lekomtsev's experience is far from unique. It's widely recognized that Russian police routinely fabricate charges against Russian gay men and that Russian police routinely commit violence against gay men. All that should have been grounds to grant Mr. Lekomtsev asylum. Instead, the IJ and the board denied him immigration relief based on those false charges, essentially accepting— presentation of the evidence, not the least of which was that he didn't initially disclose the fact that he was the subject of a pending criminal case from which he had left Russia. And when asked why he didn't disclose that, his explanation was, well, I thought they would deport me if they heard I was a wanted criminal. That's correct, Your Honor. But, you know, as this court explained in Iman, you know, omissions are only probative of credibility, you know, in certain circumstances. And so— So you don't think that's probative to the adverse credibility finding? So, no, Your Honor. So, you know, again, as the court explained in Barsegian, you know, if the petitioner gives an explanation for the omission or inconsistency, you know, the board has to give a cogent and credible reason to reject it. And here— the board's reasoning is, if I tell the truth, I'm afraid I'm not going to get immigration benefits. So doesn't that go to the heart of his claim for asylum? Well, so, no, he testified that he only omitted it from the initial application because he didn't understand what the form was asking due to his limited English. And an immigration nonprofit told him he would have a chance to supplement his application at a hearing for the board. But the board— I intentionally lied because I feared being ordered deported. So a admission under oath that he intentionally lied, I have trouble understanding why that isn't a basis for an adverse credibility determination. Well, again, I think he didn't testify that he intentionally lied. He testified that he didn't understand the form required him to disclose— Well, he testified to lots of things, but sometimes you can't plead facts in the alternative. One of the reasons he gave was that he specifically did not include it because he feared it would lead to his deportation. That's something entirely separate from, I don't understand the form. It's much closer to what Judge Ikuda just described, and I think accurately, as intentionally lied. He made a conscious decision not to include that information. And it wasn't because he didn't understand the form. It's because he thought it would lead to a bad result for him. Well, but he also testified that he intended— You can't plead facts in the alternative. He testified to lots of things. But at least one of those things was, I left it out on purpose. And that seems to be tough to get around. That's fair enough, Your Honor. But, again, in Iman, the court explained that, you know, omissions are— So, again, taking a step back here, you know, adverse credibility is asking whether or not there's reason to doubt whether or not the petitioner— You got somebody who said, I deliberately left it out. Isn't that reason to doubt? I don't think so, Your Honor. Because, again, you know, so this court explained that, you know, omissions are probative credibility when, you know, it suggests that if it were true, they would have, you know, included it initially. But, again, there's just no dispute here that the 2015 arrest actually happened to him. You know, there's evidence in the record. He just didn't tell him about it. Initially. But, you know, again, he said that he expected to have a chance to explain that to the board at a hearing. And so, you know, take— Well, no, no. He said that, yes. He said lots of things. But he also said, I left it out because I was afraid I'd be immediately deported. That's not based on an assumption he'd get a chance to explain. That was based on a concern that, gee, if I say this, they're going to boot me out, so I'm going to leave it back and leave it off the form. But, again, he testified that he always intended to, you know, explain to the agency at some point that he had this prior arrest that he thought— Sorry. I was going to say, the board also relied upon the 20-minute exchange at the merits hearing between the claimant and the immigration judge about the presence of either two witnesses or one witness and the advice that his Russian criminal defense lawyer had given him that if the prosecution had found a second witness, he was likely to be convicted, which, as I understand it, was essentially the motive to flee at that point. How is that improper as it relates to the adverse credibility finding? In essence, as I read the transcript, it looked to me like the immigration judge was saying this was like pulling teeth to try and get this out of the witness. So, you know, again, Your Honor, as the court explained to Iman, you know, this is at most an omission. You know, his declaration, you know, didn't expressly disclose the subsequent developments about how, you know, Russia claimed to have found a second witness. But, you know, again, at most, this is evidence that would have helped his persecution claim because it goes to show that if he returned to Russia, he would be imprisoned and convicted. But he was trying to maintain at the beginning of the hearing that he was an innocent man wrongfully framed by the Russian police. And it's easier to make that claim if you if you can stick with the story that your Russian lawyer told you their case is falling apart because they only have one witness against you. But then after 20 minutes of back and forth, he begrudgingly acknowledges. Well, when the prosecutor said they now had to, my lawyer told me it was likely I was going to be convicted. So I decided to flee. Sure. But again, you know, that information that was elicited during examination was favorable to him. Right. That goes to show that he would likely face. Well, how come he had repeatedly. Made the statement he he wasn't going to be convicted, that didn't come out to the very end. He wasn't being stupid. He was withholding that information because he feared the adverse consequence of it being on the table. So I think it wasn't discussed during the direct examination because, you know, when it got to the end of the hearing, you know, the attorney was short on time. I mean, he'd been putting in papers for a long time. The hearing is the end of the process. And it finally comes out during cross-examination, which the IJ thought took an awful lot of effort to get that out. And yet that appears to be what he said is the reason he fled in the first place. So that was the fact from the very get go. And it didn't come out until cross-examination. Sure. But again, you know, as the court explained in Iman, you know, again, this is favorable information to him. It couldn't have been that favorable if he decided to keep it that close to the vest until the very end. I mean, perhaps he I'm sorry. Yes, I question this. It was favorable. It's favorable only if the IJ determined that it was part of a false persecution. If it's if it's not part of a false persecution and the IJ is here determined that it had actually happened. And we have this serious nonpolitical crime situation, which would be unfavorable to him. So it's hard to say this information is favorable to him. How would you address that? Well, so first of all, we go to his cat claim at least, right? You know, the Serious Nonpolitical Crime Bar does not bar a cat claim. So it helped him there. But, you know, I guess turning to the Serious Nonpolitical Crime Bar, you know, none of the evidence that the IJ and the board cited in support of the serious reasons finding is actually substantial evidence to support a finding of serious reasons. OK, well, that's that's a legal analysis you were you were focusing on. Was this information favorable? Would he have thought it was favorable? And there are plenty of reasons not to think it was favorable, it seems, in the context of the statutory regulatory context. Sure, that's that's fair enough, Your Honor. But again, I think his objective intent as to what is or is not favorable isn't really what's relevant here. You know, again, as the court explained, it wasn't his intent. It was unfavorable. And that's why he withheld it. I mean, he specifically testified to that. Sure. But, you know, taking a step back again, you know, the the average credibility inquiry is, you know, does testimony give reason to doubt the veracity of the applicant's persecution claims? It's nothing about either the omission of the arrest or the testimony that came out later at the hearing about the developments in his criminal case. Give any reason to doubt his claims that he was persecuted by the police based on sexuality. So if I could turn to the serious reasons finding because I'm running short on time. So as this court explained in Gonzales Castillo, you know, the relevant standard needed to justify a finding of serious reasons is that there has to be specific facts connecting the petitioner to the crime. And that's just what's absent here, especially in light of the undisputed evidence that Russia routinely fabricates charges against gay men. But we do have the Interpol red flag and that that I mean, I hear I take your point about the fact that it could be contrived, but it does go into some detail as to what evidence the Russian prosecutor claimed they have. And if it's true, then those would be serious reasons, would they not? Well, but if you so there's certainly more detail than the red notice in Gonzales Castillo, but none of the details actually connect. In Gonzales Castillo, we didn't have any of those supporting facts, did we? So no. So, you know, like we just had a red flag notice that said, you know, stop this guy if he comes to your checkpoint. I think there was sort of a description of the crime in Gonzales Castillo about how he'd committed a strike, something like that. And this court found that not sufficient. But if you look at the red notice here, there's just no facts connecting Mr. Lacombe said to the crime. It does describe in detail, you know, the victim, the time, et cetera. But the only mention of Mr. Lacombe said is his name and the address. Right. There's nothing about, you know, the username used in Skype, IP address. I thought he had admitted that he had been on the Internet. I think not during the time. Certainly had been an Internet at some point in his life, I assume. But none of us, you know, as the court explained in Gonzales Castillo, you know, like this court has never upheld a serious reason finding without some corroboration of the contents. And the government also said there was a Russian criminal resolution, which they said was analogous to an arrest warrant. Is that correct? I think so. Well, Your Honor, I mean, it seems to be it's like unilateral from the prosecution. I don't know that there's any government sign off on it, but it has similar contents to the red notice where it just, you know, says his name and address and then sort of describes the crime. But there's no evidence in that resolution. So the serious reasons to believe is probable cause, which is we've held, which is just a fair probability. So we have an interval notice with details and an arrest warrant with details. And so why isn't that enough to create probable cause in this context? But it's not just details again. So in Gonzales Castillo, the standard is, as court emphasized, is specific facts connecting Gonzales Castillo to the crime. So for instance, in Go, you know, the petitioner conceded that he was involved in a drug conspiracy financing scheme. In Villalobosura, the petitioner admitted that the description of his appearance matched his actual appearance and that he was within, you know, three or four miles of the crime. So in all the court, in all cases, there were those court has upheld a serious reasons finding. There was some corroboration of, like, actual facts that concretely tie the petitioner to the crime. And that's absent here. You know, most, as you pointed out, you know, the arrest warrant and the resolution, you know, describe the crime in detail. But nothing ties the crime to Mr. Likhansev. And so I think given those details, it's a way to get the arrest warrant. In other words, they describe the crime and they said he was the perpetrator and they issued an arrest warrant. That's usually enough to tie a person to it. And wasn't it on the basis of that provisional arrest warrant that Department of Homeland Security arrested him here in North Seattle? That's true, Your Honor. So is he currently being held on that provisional arrest warrant? He's currently detained in immigration detention. I don't even know if it's covered by the extradition treaty between Russia and the United States. Is there an extradition request? I don't know, Your Honor. All right. Do you want to save some time for rebuttal? Yes, please. Thanks. OK. We'll hear from the government. Do you find the button there? Good morning, Your Honors. Jessica Burns on behalf of the Attorney General. Mr. Likhansev based his asylum application on two arrests, as we've discussed. The 2015 arrest for a sex crime over the internet with a child and the 2016 arrest for homosexual propaganda. The 2015 arrest was the critical basis for his past persecution claim. And he claimed it was pretext for persecution. And yet despite this being essentially the sole incident of past harm, he deliberately omitted it from his asylum application. This misrepresentation led the agency to not know what to believe. Was he being persecuted for a crime he didn't commit? Or was he being prosecuted for a crime that he did commit? And as a result, the agency properly questioned his credibility, found him not credible, and denied his applications for relief and protection from removal. But then we run into the Russian legal system. And I feel like I'm in a house of whores or hall of mirrors or something because the question you just posed could be applied to either of the arrests or charges. And I'm not sure how the U.S. system is supposed to deal with that. I mean, it could be that he actually committed those crimes or properly charged, as you hope a legal system would act. But we also know that there are Americans being held in Russian prisons on charges that seem imaginary, at least from our perspective. And how is the U.S. immigration system and how is this court supposed to sort all that out? Well, particularly in the context of credibility, we look at the totality of the circumstances. Now, Mr. Lakomstov claimed that he fled Russia in the middle of a trial for which he was facing 20 years in prison. He came to the United States. He applied for asylum. And he only disclosed this 2016 arrest for homosexual propaganda, a crime that he was never prosecuted for. If he was truly fleeing from this sentence for an offense he didn't commit, a sentence of 20 years in prison that he didn't commit, one would think that he would disclose it on his application. And he only revealed it after he had been confronted with the Interpol red notice for his arrest and then subsequently filed a new asylum application. An omission of this magnitude is, again, it goes to the sole basis or one of the sole bases for his entire application for relief and protection from removal. And the application itself directed him to address any past harm he experienced, why he feared harm in the future. And it specifically asked him if he had ever been arrested, imprisoned, accused, charged, detained, interrogated, or convicted of any crime outside the United States. So for him to say that he thought he could update the application or that he thought that he revealed it all by disclosing the second arrest is disingenuous. Well, he did. As I recall, he made sort of a general acknowledgement that he'd been arrested by Russian police and who had harassed him for being gay. But that was all he said. Well, if you look at the first asylum application, the 2017 application, he stated, I have never committed any crime. I've been arrested by the police because I'm a gay man. They beat me, threatened torture with electricity, and forced me to confess guilty to propaganda of homosexuality. Now, that's the 2016 charge. And his testimony was that the pictures of him kissing another man were sufficient for a charge of homosexual propaganda. Putting aside the problems with that Russian criminal statute, he essentially admitted that he had committed that second crime. But his claim all along was that the first crime, he never committed it, and he was solely targeted because he's gay. And if that were true, you would think that that's what he would base his initial asylum application on when he came to the United States. And instead, he didn't reveal it because he was fearful of being deported, which certainly left the immigration judge on board not knowing what to believe. Again, whether the arrest was pretext or whether he actually committed the crime. And we don't know the answer to that and can't know the answer to that. I understand the standard review is such that our job is not to second-guess the credibility determination or any of the factual determinations made by the immigration judge. And yet, I'm still confounded by the problem because we don't know. But it's his burden of proof before the agency to prove his eligibility for relief, his past persecution claim, his future persecution claim. And again, to warrant reversal, he has to show that the record evidence compels reversal, and he certainly has not met this burden. I know this is not in the record, but my understanding was he was arrested by DHS on the basis of the provisional arrest warrant. Correct. Is there an extradition request pending? I'm not aware of an extradition request. Again, it would just be removal. If there were, then he would have a right to a hearing in front of a federal magistrate judge to establish both probable cause and identity. Yeah, I have not been notified of any extradition requests. There's been a few cases in our office where the two have overlapped, and I haven't heard of one in this. The basis for the arrest may well have been the provisional arrest warrant, but he was also here out of status and so on, for which they would be authorized to arrest him. Correct, and his removal to Russia would solely be on, you know, removability grounds, not on an extradition treaty or extradition. And I take it he's being held without bail in Tacoma? Yes, Your Honor. Are we removing people to Russia right now? Currently, there is no bar to removal to Russia by DHS. How frequently it's happening, I'm not sure. That kind of gets off the territory, too, but I can't help but think, given current circumstances, and I think he's, what, 40 or something like that. Are we just removing him to the Wagner Group and cannon fodder in Ukraine, and does this really make sense for the U.S. government at this point in time? I believe that DHS, you know, decides actual removals in individual cases based on the circumstances of those cases. I am not aware of any bar to removal to Russia, but, again, I don't know how frequently they are putting individuals on construction. So even if we deny relief, they may or may not remove him is what you're saying? I mean, I think it will be based on the circumstances and what's going on, and it's probably constantly changing. The court can decide this case solely on credibility grounds. It's dispositive of asylum withholding and CAT. However, there are other bars to relief in this case, both the serious nonpolitical crime bar. Turning to that, I think that this case falls squarely under Villa Lobos and is distinguishable from Gonzales Castillo for the reasons your honors have mentioned. This was a very detailed red notice. There was a Russian criminal resolution. There was also an arrest warrant after he fled in the middle of trial. All of these documents gave significant details about the case, the facts of the crime, and the finding of a serious nonpolitical crime is also supported by Mr. Lakomstov's own testimony that the victim and his mother appeared at the hearing and testified against him and that his computer and phone were seized and his attorney told him he was likely to be convicted. Again, this puts it squarely under Villa Lobos where the court found that there was sufficient evidence for a serious nonpolitical crime finding. I don't think I've ever dealt with the serious nonpolitical crime situation before. This is the first time I can think of where the source of the allegation is itself as suspect as the Russian legal system appears to be today, certainly in its treatment of American citizens and the attitude of the government toward gay men has been pretty well established. So how do we, if we don't have confidence, or at least I don't have confidence in what the Russian legal system provides, I don't know how to deal with that in the context of, okay, they've charged him with these crimes and he's likely to be convicted and I've already heard how the conviction rate in Russia is not good to be a defense lawyer in Russia. What's to be accomplished by applying a doctrine which seems to be premised on a legal system that actually functions and is at least fair in some respect if you don't have any confidence in that foreign legal system? I mean, lots of foreign legal systems are suspect or have issues with their fairness. They suspect ours. But to say that you could never rely on a foreign crime because their legal system is less fair would undermine the entire bar. And I get that. The question is, is there a place in the analysis for the serious crime bar, serious nonpolitical crime bar, to assess whether we think this really is a nonpolitical crime or whether it's a crime that may have been fabricated or a conviction that may have resulted because of, in this case, perceived prejudice against gay men? Yes, Your Honor. So the government bears the burden of establishing that there's serious reasons to believe an applicant committed a serious nonpolitical crime. That is probable cause, which is a fair probability that the applicant committed the crime. And then he can rebut that finding by a preponderance of the evidence. And here Mr. Lakomsov did submit evidence showing the problems with the Russian legal system, particularly against homosexuals. But the board and the immigration judge found that there wasn't enough in this record to show that this charge, that this prosecution was pretext or that was an act of persecution. And to hold otherwise would say that we could never rely on an Interpol red notice from a country where their legal system has injustices. You observed before, and I think correctly, that this case, we could resolve this case just based on the credibility, adverse credibility determination. We do have these other findings which could have lasting effect, the false application and the nonpolitical crime bar. If we agreed with you with regard to the adverse credibility determination but had concerns about the other pieces, do we need to deal with the other pieces? And what would happen if we did or did not? I mean, is he now permanently barred as far as DHS is concerned from any relief under the statute because he submitted what has been deemed to be a fabricated application? Well, the serious nonpolitical crime bar only bars asylum and withholding of removal. I think Your Honor is talking about the frivolous asylum bar, which bars any benefit, which includes asylum. I believe adjustment of status and maybe some other benefits under the INA. Now, what was before this court, what was before the immigration judge, what was before the board was only his applications for asylum, withholding and CAT. So any future adjustment application is entirely speculative and he could deal with the frivolous asylum issue, I guess, at that point, if he were ever to apply for some other benefit under the INA. So the current BIA decision wouldn't have what, race judicata type effect? I mean, it might. To preclude him from applying in the future? It would essentially bar him forever from seeking any benefit under the INA. But do we have to deal with that issue regardless? Again, that's not the issue before the court. Any future applications are entirely speculative, but even if the court wants to address frivolousness, it's supported by substantial evidence in this case Excuse me, I have a question about that. In OODA, we said that we evaluate whether a given aspect of a petitioner's asylum application was a material element of that application. And by element, we mean a constituent part of a claim that must be proved for the claim to succeed. So we know what the elements are for an asylum claim. You have to be a refugee. There has to be past persecution or a likelihood of future persecution. I don't see how his lie about the conviction in Russia would be a material element of his affirmative asylum claim. Could you address that briefly? Yes. Well, I just want to point out that what constitutes an element was never exhausted to the board. He never raised a specific argument, so the board did not have the opportunity to parse out this exact meaning. But his entire claim was that he was arrested in 2015 and charged with this crime, the sex crime against a child, as persecution. And he just completely omitted it from his application. And so how is that not a material element of his past persecution claim? In matter of YL, the board explained that an element is fabricated when it misrepresents the truth. In the 2017 application, he was asked, what past harm did you experience and were you ever arrested, interrogated, charged with any crime? And he only revealed the 2016 arrest. So by purposely and deliberately omitting that 2015 arrest, that's a material misrepresentation that is certainly pertinent and an element of his past persecution claim on account of a protected ground. I mean, he claimed past persecution based on the 2016, the later arrest. And that was the basis of his claim. I mean, the fact that he omitted other things, I don't see how that's part of his claim. But the 2016 arrest was for homosexual propaganda, an offense he was never charged with or never prosecuted for. The 2015 arrest, and he admitted that the 2016 arrest, that the pictures of him kissing another man were sufficient for the charge. He's saying he had nothing to do, they have the wrong guy for this 2015 arrest. And that certainly goes to, and that they only targeted him because he's gay. And so that certainly goes to whether or not he experienced past persecution, whether or not he will experience future persecution if he is indeed convicted, and whether or not this persecution was on account of his sexual orientation, that he's saying they arrested me and they charged me with this very significant offense solely because I am gay. Thank you. Counselor, you are out of time. Thank you, Your Honors. I'm going to start with Judge Clifton's question about whether or not the credibility finding is grounds to dispose of this case. And it's not for the reasons you all mentioned. One is that they might have bearing on future applications. And then two is that LaCombe made claims for asylum based on evidence other than his own testimony. So there was evidence in the record from Mr. Khamovich and Dr. Moll about the persecution that gay men in Russia face. And so he could establish entitlement to asylum. Can you articulate what that other evidence is? Right. So his expert testified that gay men in Russia are routinely beaten by police, especially in prisons, right? And so even apart from his testimony, there is evidence that he would likely be imprisoned if returned to Russia and that he would likely face torture and persecution there because he's a gay man. So even if this court upholds the average credibility finding, the agency could find that he met asylum based on that other testimony. The government argues that the country report showed killings and torture of homosexuals only in Chechnya, which LaCombe said is not from. What's your response to that? So the country report emphasized that, you know, anti-gay violence and killings were especially bad in Chechnya, but it was not limited to that. And so even apart from the country report, there was Mr. LaCombe's expert declarations from Dr. Moll and Mr. Khamovich that gay men, you know, were tortured in prison, not just in Chechnya. So, you know, this court should reach and reverse both the serious non-political crime bar and the frivolousness bar. I thought the country conditions report talked about not only residents of Chechnya, but also sort of outspoken leaders. And the agency found that he was neither a resident nor an outspoken leader. Right, so same response. So, you know, so political activists faced especially likely torture and persecution. But you've got to show some nexus beyond the country condition report of what life is like in different parts of Russia. Right, but again, there's undisputed evidence that if he were to return to Russia here, he would likely be jailed because there's the outstanding arrest warrant because he fled during his criminal proceeding. And there's evidence that once in jail, he'd likely be beaten because he is gay. So this court. And that could be true even if he was guilty of the criminal charges he was faced with. Correct, that's correct. So does that mean that the risk of the danger of being in a Russian prison is such that the strong claim can be offered by somebody who really is a criminal? Yes, Your Honor. This is back to the House of Mirrors. Right, yeah. I mean, you know, especially under the CAT, you know, like the serious non-political crime bar is not a bar under the CAT. You know, CAT is designed for people even who have committed serious crimes. So this court should reverse those other findings and remand for the board to reconsider. Thank you for your argument. I also want to thank you and your firm for taking this case pro bono. Thank you, Your Honor. Thank you very much. The court really appreciates the help. Case just argued is submitted and we are adjourned for the day.
judges: TALLMAN, CLIFTON, IKUTA